846 A.2d 569

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ARTHUR J. JONES, A/K/A, JAMIE MATTHEWS, JAIMIE ART, ARKEEM JONES, JAMIE JONES, JAMES ARTHUR AND JAMES MATTHEWS, DEFENDANT–RESPONDENT.

Argued January 6, 2004—Decided April 21, 2004.

*Johanna A. Barba,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Sandra L. Manning* and *Evan S. Goddard,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Manning,* on the briefs).

Justice ZAZZALI delivered the opinion of the Court.

This appeal presents two questions for our consideration. The first is whether three controlled purchases of suspected cocaine at a single-family dwelling from persons with prior drug-related

arrests and convictions establish probable cause sufficient for the issuance of a search warrant when the confidential informant who supplied the initial tip is of unknown reliability. The second is whether a suspect's seven-year-old arrest for assault against a police officer and a weapons-related crime justifies a "no-knock" entry in the totality of the circumstances. The Appellate Division held that the State did not demonstrate probable cause for the search warrant and that the facts did not support a departure from the knock-and-announce requirement.

We conclude that the totality of the circumstances did establish probable cause for the issuance of the search warrant. We also hold that, because the police had a reasonable, particularized suspicion that knocking and announcing their presence in the circumstances presented would threaten their safety, the issuance of a no-knock warrant was proper. We therefore reverse.

## I.

During the week beginning June 18, 2001, the Cape May County Prosecutor's Office Narcotics Task Force (Narcotics Task Force) received information from a confidential informant of "unknown reliability" that Darryl Jones (brother of defendant), Kenneth Powell, and Stephanie Williams were distributing cocaine from a single-family residence in Wildwood. In addition, the informant advised the police that those three individuals were selling cocaine at the Sportsmen's Tavern in Wildwood.

The informant cooperated with the police and performed three separate controlled purchases at the Wildwood residence between June 18 and June 22, 2001. Each controlled buy followed the same procedure: the officers searched the informant to ensure that he [1] carried no money or contraband on his person; they provided the informant with money bearing pre-recorded serial

---

[1] To protect the identity of the informant, the affidavit in support of the search warrant application did not disclose the informant's gender. For convenience, we will use masculine pronouns when referring to the informant.

numbers to purchase a specified amount of cocaine; the informant then proceeded to the Wildwood residence, stepping inside for "a short period"; after emerging from the home, the informant returned to the prearranged location and turned over the suspected cocaine to the police; and, before departing, the officers searched the informant again to ensure he did not have any contraband or money on his person. During each of the controlled purchases, the police maintained surveillance of the informant throughout the process.

On the occasion of the first and second controlled purchases, the informant bought suspected rock cocaine from Darryl Jones. The first buy occurred in the presence of Stephanie Williams. On the third occasion, the informant purchased suspected rock cocaine from Kenneth Powell. Although there is some indication in the record that suspected drugs purchased during controlled buys typically are field-tested and sent for lab analysis to confirm their composition, the affidavit submitted by the police in support of their request for a search warrant did not disclose whether any testing was performed on the suspected narcotics in this case.

Before seeking a search warrant, Narcotics Task Force members performed criminal background checks on Kenneth Powell and Darryl Jones. According to Agent Darrell Shelton's affidavit offered in support of the search warrant application, the officers learned from the suspects' criminal history records that Powell had been arrested for possession and distribution of cocaine in 1992, convicted of distribution of cocaine in 1992, arrested for possession of marijuana in 1997, and arrested in 1997 and convicted in 1998 for distribution of cocaine. Darryl Jones, described as a 5'10" tall male weighing 170 pounds, had been arrested for criminal trespass, disorderly conduct, and harassment in 1994; arrested for assault on a police officer, criminal mischief, unlawful possession of a weapon, and aggravated assault with a weapon in 1994; arrested for distribution of a controlled dangerous substance (CDS) in 1995; and arrested for possession of a CDS, distribution of a CDS, and distribution of a CDS on school

property in 1998. The Cape May City Police Department (CMPD) and the Narcotics Task Force were responsible for all of the reported arrests of Darryl Jones. We take judicial notice that the City of Cape May is located less than ten miles from Wildwood, where all of the events in this case occurred.

Agent Shelton applied for a search warrant before a judge of the Wildwood Municipal Court on June 22, 2001. To establish probable cause for the search, he set forth the information provided by the informant, detailed the facts and circumstances of the three controlled buys, and described the arrest records of Darryl Jones and Powell. Based on those facts, and on his knowledge, training, and experience as detailed in the warrant, Shelton asserted that there was probable cause to believe various provisions of the Comprehensive Drug Reform Act of 1986 (Drug Reform Act), *N.J.S.A.* 2C:35–1 to 36A–1, were being violated at the Wildwood residence. Accordingly, his application sought permission to search the residence, to search the persons of Darryl Jones, Kenneth Powell, and Stephanie Williams, and to search "[a]ny person reasonably believed or identified to have [a] connection to illegal property or contraband during the execution of the search warrant."

In addition to requesting the search warrant, Shelton sought authority to execute the warrant without knocking and announcing the police presence. Shelton made his request for the no-knock provision based on the destructibility of evidence and officer safety, calling particular attention to Darryl Jones's prior arrests. He stated:

This request is made for the following reason(s): The easy disposal of the evidence *and the physical protection of the police officers when making entry on a search warrant in drug related cases* as specifically documented below. Additionally, the information set forth ... above which reflects a November 6, 1994 arrest of Darryl Jones by CMPD *for aggravated assault on a police officer and unlawful possession of a weapon.*

[(Emphasis added.)]

The municipal court granted Shelton's application and authorized a no-knock entry.

Although the exact time is not clear from the record, it appears that "right before" the police executed the warrant on June 23, 2001, they had the informant perform a "confidence buy," following the same procedures of the three prior controlled purchases. Generally, police conduct a confidence buy to confirm the continued presence of drugs at the location about to be searched. After the informant returned with suspected cocaine, the police executed the no-knock warrant. They found defendant in the residence, seated in front of a table. A bag of cocaine and drug paraphernalia were on the table. During a search of defendant's person, the officers found two of the twenty-dollar bills used in prior controlled purchases and two bags of cocaine.

The grand jury issued a nine-count indictment against defendant, charging him with numerous drug-related offenses, including third-degree possession of cocaine, *N.J.S.A.* 2C:35-10a(1).[2] Defense counsel moved to suppress the cocaine, drug paraphernalia, and marked money as the products of an illegal search warrant. The trial court denied the motion, holding that the three controlled purchases established probable cause to issue the warrant. Concluding that a prior charge of assault on a police officer by a suspect named in the warrant application formed a sufficient basis to issue a no-knock warrant, the court stated:

> One of the defendants ..., Darryl Jones, had been charged with an assault on a police officer. That charge is a basis, better than most, for the issuance of a no-knock warrant.
>
> It's really not of particular consequence that he ended up pleading to something less than that or that the actual conviction may have been a fourth-degree possession of a weapon. What was of concern to the officers, and understandably so, is their safety.
>
> Someone with that kind of a charge in their past, when joined with the unfortunate marriage that often occurs between drugs and weapons, was a sufficient basis for the magistrate to have issued the no-knock provision of the warrant.

Pursuant to a negotiated plea-agreement, defendant pled guilty to third-degree possession of cocaine and was sentenced to a four-

---

[2] The additional charges against the three suspects named by the informant are not at issue.

year term of incarceration. Appropriate penalties were also imposed. Thereafter, he appealed the ruling on his motion to suppress and challenged his sentence. The Appellate Division, disagreeing with the trial court, ruled that the search warrant was unlawful because of the absence of probable cause and because there were insufficient facts set forth in the affidavit to support the "no-knock" entry provision. *State v. Jones*, 358 *N.J.Super.* 420, 425, 818 *A.*2d 392, 395 (2003).

With respect to the search warrant in general, the panel relied on this Court's holding in *State v. Sullivan*, 169 *N.J.* 204, 777 *A.*2d 60 (2001), for the proposition that a controlled buy does not conclusively establish probable cause. *Jones, supra*, 358 *N.J.Super.* at 428, 818 *A.*2d at 397. The appellate court also noted that the police officers failed "to confirm that the suspects, Darryl Jones, Kenneth Powell[, and] Stephanie Williams, lived in or were otherwise connected to the residence." *Ibid.* Further, the panel emphasized that the warrant application gave no indication that the police made any effort to confirm that the substance purchased by the informant was actually cocaine. *Id.* at 429, 818 *A.*2d at 397–98. In view of those alleged defects, the court concluded that probable cause did not exist to issue the warrant.

Stating that a "stale prior arrest" does not justify a no-knock warrant, the panel also concluded that the warrant was invalid because the officers did not articulate a sufficient reasonable suspicion to authorize entry of the home without first knocking and announcing their presence. *Id.* at 434–35, 818 *A.*2d at 401. In view of its holding, the Appellate Division did not address defendant's argument respecting his sentence. *Id.* at 436 n. 5, 818 *A.*2d at 402 n. 5. We granted the State's petition for certification. 177 *N.J.* 224, 827 *A.*2d 291 (2003).

## II.

Although we believe that the no-knock issue is the central question presented in this appeal, in view of its effect on the public interest and officer safety, we nonetheless follow our traditional

analysis and consider first the threshold issue of whether there was sufficient probable cause to issue the search warrant.

A.

■ The Fourth Amendment of the United States Constitution protects all persons from unreasonable search and seizure, providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The New Jersey Constitution provides similar protection. *N.J. Const.* art. I, ¶ 7. Except in limited circumstances, police officers must obtain a warrant from a neutral judicial officer prior to conducting a search or seizure of property. *See State v. DeLuca,* 168 *N.J.* 626, 631, 775 *A.*2d 1284, 1287 (2001) (explaining that police officers must obtain warrant before search of property unless search " 'falls within one of the recognized exceptions to the warrant requirement' ") (quoting *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92, 95 (2000)). The issuing authority "must be satisfied that there is probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched." *Sullivan, supra,* 169 *N.J.* at 210, 777 *A.*2d at 64.

■ It is well settled that a search executed pursuant to a warrant is presumed to be valid and that a defendant challenging its validity has the burden to prove "that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable." *State v. Valencia,* 93 *N.J.* 126, 133, 459 *A.*2d 1149, 1152 (1983). "In considering such a challenge, '[w]e accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant.' " *Sullivan, supra,* 169 *N.J.* at 211, 777 *A.*2d at 64 (quoting *State v. Marshall,* 123 *N.J.* 1, 72, 586 *A.*2d 85, 119 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993)) (alterations in original). "Thus[,] when the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant,

and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search." *State v. Kasabucki*, 52 *N.J.* 110, 116, 244 *A.*2d 101, 103 (1968) (citing *United States v. Ventresca*, 380 *U.S.* 102, 109, 85 *S.Ct.* 741, 746, 13 *L.Ed.*2d 684, 689 (1965)).

"When determining whether probable cause exists, courts must consider the totality of the circumstances, and they must deal with probabilities." *Schneider v. Simonini*, 163 *N.J.* 336, 361, 749 *A.*2d 336, 350 (2000) (citing *Illinois v. Gates*, 462 *U.S.* 213, 230–31, 238, 103 *S.Ct.* 2317, 2328, 2332, 76 *L.Ed.*2d 527, 543–44 (1983)), *cert. denied*, 531 *U.S.* 1146, 121 *S.Ct.* 1083, 148 *L.Ed.*2d 959 (2001). Information related by informants may constitute a basis for probable cause, provided that a substantial basis for crediting that information is presented. *Sullivan, supra*, 169 *N.J.* at 212, 777 *A.*2d at 64; *State v. Smith*, 155 *N.J.* 83, 92, 713 *A.*2d 1033, 1038 *cert. denied*, 525 *U.S.* 1033, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998).

When examining an informant's tip to determine whether it establishes probable cause to issue a search warrant, the issuing court must consider the "veracity and basis of knowledge" of the informant as part of its "totality" analysis. *State v. Novembrino*, 105 *N.J.* 95, 123, 519 *A.*2d 820, 837 (1987) (citing *Gates, supra*, 462 *U.S.* at 238–39, 103 *S.Ct.* at 2332, 76 *L.Ed.*2d at 548). "An informant's veracity may be shown by demonstrating that the informant proved to be reliable in previous police investigations." *Sullivan, supra*, 169 *N.J.* at 213, 777 *A.*2d at 65. Such instances, however, " 'do not conclusively establish an informant's reliability.' " *Ibid.* (quoting *Smith, supra*, 155 *N.J.* at 94, 713 *A.*2d at 1039). An informant's basis of knowledge is sufficient "if the tip itself relates expressly or clearly how the informant knows of the criminal activity." *Ibid.* (internal quotation marks and citations omitted). The absence of such explicit information within the tip itself, however, is not fatal if "the nature and details revealed in the tip ... imply that the informant's knowledge of the alleged

criminal activity is derived from a trustworthy source." *Ibid.* (internal quotation marks and citations omitted).

"Independent corroboration is necessary to ratify the informant's veracity and validate the truthfulness of the tip" and is considered "an essential part of the determination of probable cause." *Smith, supra,* 155 *N.J.* at 95, 713 *A.*2d at 1040. However, if the informant's tip fails to demonstrate sufficient veracity or basis of knowledge, a search warrant issued on the basis of the tip may still pass muster if other facts included in a supporting affidavit justify a finding of probable cause. *Sullivan, supra,* 169 *N.J.* at 214, 777 *A.*2d at 66; *Novembrino, supra,* 105 *N.J.* at 121–22, 519 *A.*2d at 835–36. " '[T]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Smith, supra,* 155 *N.J.* at 93, 713 *A.*2d at 1038–39 (quoting *Gates, supra,* 462 *U.S.* at 238, 103 *S.Ct.* at 2332, 76 *L.Ed.*2d at 548).

The corroborating factors that may be considered by a court making a probable-cause determination on the basis of an informant's tip depend on the unique facts and circumstances presented in each case. Some relevant factors may include controlled drug purchases performed on the basis of the informant's tip, the positive test results of narcotics obtained during a controlled purchase, and records corroborating an informant's account of the location of suspected drug activity. *Sullivan, supra,* 169 *N.J.* at 215–17, 777 *A.*2d at 66–68. The experience that an officer submitting a supporting affidavit has in investigating and apprehending drug dealers constitutes another factor that a court should consider. *Novembrino, supra,* 105 *N.J.* at 126, 519 *A.*2d at 839.

In addition, because we have recognized that a suspect's criminal record may be considered when determining probable cause to arrest, *State v. Valentine,* 134 *N.J.* 536, 550, 636 *A.*2d 505, 512

(1994), it follows that a suspect's criminal history is also germane to a search analysis. *See Novembrino, supra,* 105 *N.J.* at 127, 519 *A.*2d at 839 (considering interaction with person known to have prior drug-related arrest as factor in totality of circumstances); *State v. Ebron,* 61 *N.J.* 207, 213, 294 *A.*2d 1, 4 (1972) (explaining that if defendant was known drug user, that fact may be considered during probable-cause analysis). A brief examination of *State v. Sullivan, supra,* highlights the importance of police corroboration.

In *Sullivan* we concluded that a police officer's affidavit provided sufficient facts to demonstrate probable cause. The police in that case received a tip from a confidential informant of unproven reliability that the defendant was selling cocaine out of a specific apartment in a six-unit dwelling located in Plainfield. 169 *N.J.* at 207, 777 *A.*2d at 62. The informant gave the police the first name and a general description of the defendant, identified the specific unit in which he was located, and provided the phone number of the apartment. *Ibid.*

To corroborate the informant's tip, the police completed two controlled buys at the apartment using the informant. *Id.* at 208–09, 777 *A.*2d at 62–63. Because of the layout of the apartment building, the police could not directly observe the informant enter the individual unit. *Id.* at 208, 777 *A.*2d at 62. The police, however, reviewed utility records to confirm that the telephone number provided by the informant matched the telephone number of the apartment in the multi-unit building where the controlled buys were purportedly made. *Id.* at 209, 777 *A.*2d at 63. The officers also confirmed that the substance purchased during those transactions was cocaine. *Id.* at 208–09, 777 *A.*2d at 62–63. The police included all of that information in the affidavit submitted with the search warrant application. *Id.* at 209, 777 *A.*2d at 63. In those circumstances, we concluded that there was sufficient corroboration of the informant's tip to demonstrate probable cause. *Id.* at 216, 777 *A.*2d at 67.

We observed in *Sullivan* that a controlled drug buy, by itself, would not conclusively establish probable cause. *Ibid.* That observation, however, was not intended to suggest that a controlled drug purchase is an inconsequential factor. Rather, as we emphasized in *Sullivan,* a controlled buy "typically will be persuasive evidence in establishing probable cause." *Id.* at 217, 777 *A.*2d at 68. Although *Sullivan* speaks of "other factors" that should be considered in addition to controlled buys, *ibid.,* the test is qualitative and not quantitative. Thus, even one additional circumstance might suffice, in the totality of the circumstances, to demonstrate probable cause when the police successfully have performed a controlled drug buy.

## B.

We now examine the totality of the circumstances, particularly the controlled buys and the prior arrest records of two of the three suspects identified in Agent Shelton's affidavit, to determine whether probable cause existed in this case. More specifically, because it is undisputed that the informant lacks a history of reliability, we must focus on the sufficiency of the officer's corroboration of the informant's tip. Those facts persuade us that the corroborative investigation conducted by the police, as detailed in Agent Shelton's affidavit, demonstrated probable cause.

Acting on an informant's tip that three named individuals were selling drugs at two specified locations in Wildwood, the police sought to confirm the veracity of that information by conducting three controlled purchases at one of those two locations. During each purchase from the single-family residence, the police sent the informant into the home for the sole purpose of buying cocaine. In accordance with the standard police procedure applied to a controlled buy, the informant was always searched before making the purchase and carried with him only the marked bills provided by the police. Each time he returned, the informant handed to the police what appeared to be rock cocaine. From the moment the informant left the police to enter the home until the moment

he returned, officers surveilled the informant to ensure that he was obtaining the suspected narcotics from the residence in question. Thus, there was no question that the substance produced by the informant during each of the three controlled buys originated from the single-family dwelling.

Although those three drug buys are themselves persuasive evidence that the informant's tip was reliable, additional evidence bolstered its credibility. The police performed criminal background checks on Darryl Jones and Powell, the two individuals identified by the informant as having sold him cocaine during the controlled purchases. Those background checks revealed that both Darryl Jones and Powell had been arrested for several drug-related offenses over the course of a six-year period and that Powell had been convicted twice of cocaine distribution, his most recent conviction occurring just three years earlier. Those arrests and convictions were additional factors in the totality of the circumstances justifying the judge's conclusion that the police had probable cause to search the Wildwood residence and its occupants.

Despite the informant's tip and the officer's corroborative efforts, the Appellate Division rejected the trial court's finding of probable cause, faulting the police for failing "to confirm that the suspects ... lived in or were otherwise connected to the residence." *Jones, supra,* 358 *N.J.Super.* at 428, 818 *A.*2d at 397. As support for that proposition, the panel noted that unlike the officers in *Sullivan,* the police in this case did not look at any utility or public records to confirm that Darryl Jones, Powell, or Williams were connected with the residence. *Ibid.*

To be sure, the affidavit does not state that the officers checked telephone or utility records as did the police in *Sullivan.* However, as we previously noted, the police in *Sullivan* were unable to observe which of the six apartments in the multi-unit dwelling the informant entered during the two controlled buys. 169 *N.J.* at 208, 777 *A.*2d at 62. Because the police had the obligation to adduce probable cause that, among those six apartments, it was

the exact apartment that the informant identified that contained the drugs and individuals he had named, they turned to utility records to confirm that the phone number provided by the informant was the number associated with the apartment listed in the warrant. *Id.* at 216, 777 *A*.2d at 67. That fact, along with the other circumstances presented, "served as sufficient indicia of the informant's reliability." *Ibid.* In contrast to *Sullivan*, there was no ambiguity in this case concerning the location from which the informant was obtaining the suspected cocaine because the officers witnessed the informant directly enter the suspect dwelling. As the Appellate Division acknowledged, there was "no question ... as to whether the informant went to a residence other than the one for which the warrant was obtained." *Jones, supra,* 358 *N.J.Super.* at 428, 818 *A*.2d at 397. Thus, in those circumstances, there was no need for the police to comb through local records to "confirm" that Darryl Jones, Powell, or Williams were connected to the residence.

The defendant also argues that the failure to include any test results in the affidavit confirming that the substance purchased at the Wildwood residence was cocaine undermined the determination of probable cause. The Appellate Division adopted that assessment, observing that "[t]he absence of such confirmation significantly, if not totally, undermine[d] the normal persuasiveness of [the] controlled buy[s]." *Id.* at 429, 818 *A*.2d at 397. We disagree. Although the inclusion of test results would have presented additional information for the municipal court judge to consider in the totality of the circumstances, their absence does not undermine the probable-cause determination that was made on the facts presented.

Even without field- or lab-testing to confirm that the substances purchased by the informant were in fact narcotics, the controlled purchases at the residence buttressed the judge's finding of probable cause. *See United States v. Wright,* 811 *F.Supp.* 1576, 1581 (S.D.Ga.1993) (rejecting argument that failure to field-test suspected drugs undermined value of controlled buys and noting

that that argument "fail[ed] to recognize that evidence upon which a search warrant is based need not be sufficient to convict at trial"). In view of the purpose and nature of the transactions detailed in the affidavit, the controlled buys cannot be mistaken for something as innocuous as a visit from a next-door neighbor to borrow a cup of sugar, as was suggested during oral argument. The circumstances detailed in the warrant application plainly indicated that the sole purpose of the transactions between the informant and the suspects at the Wildwood residence was to exchange money for drugs. Although the police supplied no test results in the affidavit to establish conclusively that the transactions were successful, nothing presented to the municipal court judge suggested that the purchased substance was anything other than what its sellers held it out to be—cocaine.

Two other considerations lend additional support to the probative value of the controlled buys in this case. First, in the affidavit considered by the issuing court, Agent Shelton set forth his extensive background investigating drug transactions, specifically detailing the training and experience he had received as a narcotics officer. Shelton's affidavit indicated that the three controlled buys had yielded what he suspected to be rock cocaine. He concluded that there was probable cause, based on his "knowledge, training, experience and the facts set forth" in the affidavit, to believe there was ongoing criminal activity at the Wildwood residence. In view of Shelton's training and experience as an agent on the Narcotics Task Force, the judge reasonably could conclude that Shelton's assessment of the nature of the substance acquired during the controlled buys was accurate.

Second, even if Shelton was incorrect regarding the composition of the suspected rock cocaine, the judge nevertheless had sufficient information to find probable cause that illegal narcotics activity was occurring at the residence. New Jersey's Drug Reform Act criminalizes not only the distribution of controlled dangerous substances, but also the distribution of *imitation* controlled dangerous substances. *N.J.S.A.* 2C:35–11. Thus, even

assuming the suspected narcotics were ultimately proven to be something other than rock cocaine, their distribution to the informant under the false pretense that they were a CDS was itself illegal. Because in these circumstances there was probable cause to believe that the sale constituted a violation of either *N.J.S.A.* 2C:35–5 (criminalizing manufacturing, distributing, dispensing, or possession with intent to manufacture, distribute, or dispense CDS), or *N.J.S.A.* 2C:35–11 (criminalizing manufacture, distribution, or possession with intent to distribute non-CDS under express or implied representation that substance is CDS), the issuance of the warrant by the municipal court judge on the basis of the facts and circumstances set forth in Agent Shelton's affidavit was proper.

In *Sullivan, supra,* we noted our expectation that "the police will continue to corroborate as much of an informant's tip as possible prior to seeking a search warrant...." 169 *N.J.* at 216, 777 *A.*2d at 67. Although we are satisfied that in the present appeal the defendant has not defeated the presumption of the warrant's validity simply because the suspected narcotics were not tested, we trust that whenever possible the police will conduct appropriate testing and disclose the results of that testing in their search warrant applications. Only through the complete disclosure of all relevant facts can the judiciary fully and accurately assess whether probable cause of illegal activity exists, and thereby fulfill its duty to safeguard citizens from unwarranted invasions of their privacy.

In sum, we hold that in the totality of the circumstances Agent Shelton adequately corroborated the informant's tip when, in addition to conducting three controlled buys, he provided detailed information to the municipal court judge regarding his education and experience with drug-related activity, expressed a conclusion based on his knowledge, training, and experience that illegal sales were occurring, and disclosed to the issuing judge the drug-related arrests and convictions of the suspects under investigation. According appropriate deference to the issuing judge, we conclude

that in these circumstances defendant "has not defeated the warrant's presumption of validity or demonstrated the unreasonableness of the police conduct." *Id.* at 217, 777 *A.*2d at 68.

## III.

Having determined that there was sufficient probable cause to issue the search warrant, we now consider the validity of the warrant's no-knock provision, which, as the name suggests, "authorizes police officers to enter a home or business without first knocking and announcing their presence." *State v. Johnson,* 168 *N.J.* 608, 611, 775 *A.*2d 1273, 1275 (2001).

## A.

Although law enforcement officers generally are required to knock and announce their presence before entering a dwelling, that requirement is not absolute. In *Johnson, supra,* we explored in some detail the origins of the knock-and-announce requirement and the evolution of its exceptions. *Id.* at 615–19, 775 *A.*2d at 1277–80. From our analysis of both federal and state jurisprudence,

> we discern[ed] the following tenets. First, to justify a no-knock warrant provision, a police officer must have a reasonable, particularized suspicion that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence. Second, the police officer must articulate the reasons for that suspicion and may base those reasons on the totality of the circumstances with which he or she is faced. Third, although the officer's assessment of the circumstances may be based on his or her experience and knowledge, the officer must articulate a minimal level of objective justification to support the no-knock entry, meaning it may not be based on a mere hunch. [*Id.* at 619, 775 *A.*2d at 1279–80.]

Because the validity of the warrant before us turns on officer safety, we limit our discussion in the present appeal to that exception.[3]

---

[3] Agent Shelton premised his application for a no-knock warrant on both officer safety and "[t]he easy disposal of the evidence." However, in this appeal the State has limited its argument regarding the validity of the no-knock

■ The objective facts that, in the totality of the circumstances, give rise to a reasonable suspicion of a heightened risk to officer safety depend on the particular circumstances of each case; "boilerplate" police concerns are insufficient. *State v. Bilancio,* 318 *N.J.Super.* 408, 416–17, 724 *A.2d* 278, 283–84 (App.Div.), *certif. denied,* 160 *N.J.* 478, 734 *A.2d* 793 (1999). For example, in *Johnson* the police applied for a search warrant based on an informant's tip and a controlled buy performed at the defendant's apartment. 168 *N.J.* at 612–13, 775 *A.2d* at 1275–76. At the end of his oral testimony, the officer applying for the warrant stated that he was " 'requesting a no knock search warrant for officers['] safety and it means that the narcotics can be easily [ ] destroyed. . . .' " *Id.* at 613, 775 *A.2d* at 1275 (alterations in original). On appeal, we concluded that the officer's one-sentence justification for a no-knock warrant was insufficient to establish a particularized suspicion that officer safety would have been compromised if the police had been required to announce their presence before entering the defendant's dwelling. *Id.* at 620–23, 775 *A.2d* at 1280–82. However, we noted for future guidance that "information concerning defendant's criminal history or background . . . might have supported the conclusion that defendant had a propensity for violence." *Id.* at 624–25, 775 *A.2d* at 1283. Specifically, we explained that the defendant's prior aggravated manslaughter offense cited within his pre-sentence report, but not disclosed to the court that issued the no-knock warrant, "might have been used

provision to the officer-safety exception. Because Agent Shelton's conclusory statement regarding the easily disposable nature of the evidence, without more, was insufficient to satisfy the destructibility-of-evidence exception to the knock-and-announce rule, we do not address that exception in this decision. *See Johnson, supra,* 168 *N.J.* at 620, 775 *A.2d* at 1280 (noting that "small quantities of narcotics sold out of a person's home are almost always susceptible to destruction or disposal" and explaining that "[t]o satisfy the destructibility-of-evidence exception to the knock-and-announce rule, the police must articulate some reason specific to the crime, to the person under investigation, or to some other permissible factor, that leads them reasonably to believe that destruction of evidence is more than a hypothetical possibility").

to support a reasonable suspicion to believe that officer safety would be compromised without a no-knock entry." *Ibid.*

In analogous circumstances we have acknowledged that a defendant's prior criminal history may give rise to a reasonable suspicion sufficient to justify protective measures taken by the police. In the context of protective searches performed during investigatory stops, we have recognized that knowledge of a suspect's violent criminal behavior or information that a suspect has carried weapons in the past may support an "objectively reasonable suspicion" justifying a protective frisk. *State v. Thomas,* 110 *N.J.* 673, 684, 542 *A.*2d 912, 918 (1988). Although we have noted that a suspect's criminal history, without more, is insufficient to establish reasonable suspicion of danger to the police to justify a frisk of a suspect, we also have held that "an officer's knowledge of a suspect's prior criminal activity in combination with other factors may lead to a reasonable suspicion that the suspect is armed and dangerous." *Valentine, supra,* 134 *N.J.* at 547, 636 *A.*2d at 510.

Because the same test for reasonable and particularized suspicion applies to both protective frisks and no-knock entries, we conclude that a suspect's criminal history may be used as part of the totality of the circumstances analysis to justify a no-knock entry. *See, e.g., United States v. Hawkins,* 139 *F.*3d 29, 32 (1st Cir.) (upholding no-knock provision of warrant where defendant had record of violent convictions, police knew defendant was recently involved in armed action, and police suspected defendant was aware of police investigation), *cert. denied,* 525 *U.S.* 1029, 119 *S.Ct.* 566, 142 *L.Ed.*2d 472 (1998); *United States v. Bates,* 84 *F.*3d 790, 795 (6th Cir.1996) (recognizing that "threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspects violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence").

As we recognized in *Johnson,* "the showing required to justify an unannounced entry 'is not high[.]' " 168 *N.J.* at 624, 775 *A.*2d at 1282 (quoting *Richards v. Wisconsin,* 520 *U.S.* 385, 394–95, 117

*S.Ct.* 1416, 1422, 137 *L.Ed.*2d 615, 624 (1997)).   In the unique circumstances of each case, the nature of the prior criminal behavior and the passage of time are especially important factors that will often dictate what additional showing to the court may be required.   For example, a three-year-old conviction for aggravated manslaughter raises considerable concerns for officer safety and would likely require far less additional information, if any, to justify an unannounced entry than would a fifteen-year-old arrest for stalking.

Several factors, alone or in combination, may provide sufficient justification to dispense with the knock-and-announce requirement where a suspect has a known incident of violence in his or her criminal history.   For instance, an informant's tip may reveal the presence of weapons at the scene of a proposed search that suggests an increased threat to officer safety.   *Johnson, supra,* 168 *N.J.* at 624, 775 *A.*2d at 1282–83; *United States v. Ramirez,* 523 *U.S.* 65, 71, 118 *S.Ct.* 992, 997, 140 *L.Ed.*2d 191, 198 (1998). Alternatively, an officer may know that a suspect has a violent criminal history and learn from an informant that he or she has continued to exhibit a propensity for violence during the course of controlled drug buys.   *State v. Henderson,* 245 *Wis.*2d 345, 629 *N.W.*2d 613, 623, *cert. denied,* 534 *U.S.* 1033, 122 *S.Ct.* 574, 151 *L.Ed.*2d 446 (2001).   As another example, the layout of an apartment may justify a no-knock entry where one or more of the occupants has a violent criminal past.   *United States v. Lucht,* 18 *F.*3d 541, 549–50 (8th Cir.), *cert. denied,* 513 *U.S.* 949, 115 *S.Ct.* 363, 130 *L.Ed.*2d 316 (1994).

Those examples are by no means exhaustive.   Additionally, in appropriate circumstances, some of those factors may by themselves be of sufficient concern to raise a reasonable suspicion of danger to officer safety without any evidence of a defendant's prior criminal acts.   *See, e.g., United States v. Gambrell,* 178 *F.*3d 927, 929 (7th Cir.) (holding no-knock provision of warrant justified where confidential informant involved in controlled buy indicated that suspects carried guns on their persons while inside apart-

ment), *cert. denied,* 528 *U.S.* 920, 120 *S.Ct.* 281, 145 *L.Ed.*2d 236 (1999). *But see Bates, supra,* 84 *F.*3d at 796 (refusing to ratify no-knock entry where, despite information that gun was in apartment, there was no indication that defendants "were violent and likely to use a weapon if confronted by law enforcement personnel" and in absence of any evidence that defendants "had a criminal history of violence or a reputation indicating they were likely to be violent"). As with all tests for reasonable and particularized suspicion, we reiterate that "it is incumbent upon a reviewing court to evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859, 867 (1986). Such an evaluation is necessarily fact-intensive. The lower courts are thereby charged with resolving, on a case-by-case basis, the circumstances under which an unannounced entry is reasonable under our federal and state constitutions.

### B.

With the foregoing framework in mind, we turn to the case before us. In the affidavit offered in support of his search warrant application, Agent Shelton premised his request for a no-knock entry on the need for "the physical protection of the police officers when making entry on a search warrant in drug related cases...." To supplement that boilerplate language, Agent Shelton specifically called to the judge's attention the then seven-year-old arrest of Darryl Jones by the Cape May City Police Department for assault on a police officer and unlawful possession of a weapon, indicating that that incident was of particular concern to the officers. Although this case presents a close question, we believe that, on balance, the facts supplied in the affidavit, particularly the prior arrest for assault of a police officer, give rise to a reasonable suspicion that knocking and announcing the police presence in the circumstances presented would increase the risk

to officer safety. As such, we conclude that defendant has failed to overcome the warrant's presumptive validity or otherwise to demonstrate that dispensing with the knock-and-announce requirement was inappropriate in this case.

We begin our analysis by noting that Darryl Jones's arrest for assault of a police officer and unlawful possession of a weapon were properly "used to support a reasonable suspicion to believe that officer safety would be compromised without a no-knock entry." *Johnson, supra,* 168 *N.J.* at 625, 775 *A.*2d at 1283. Past evidence of violent criminal behavior, particularly behavior directed towards law enforcement officers, is plainly probative of the heightened risk posed to officer safety. *Cf. United States v. Tavares,* 223 *F.*3d 911, 917 (8th Cir.2000) (holding no-knock entry invalid where affidavit "did not have any information that [the defendant] was known to use weapons, that he was armed or carried a weapon, or that he had a *history of violence toward law enforcement officers* ") (emphasis added); *Lucht, supra,* 18 *F.*3d at 551 (concluding nine-year-old drug-related conviction and thirteen-year-old weapons-related indictment insufficient to justify no-knock entry where officer offered only unparticularized and unsupported suspicion that defendant held anti-police sentiments). Although we readily acknowledge that a conviction for assault on a police officer would have lent even greater credence to Agent Shelton's concerns—because such a conviction would have proven beyond a reasonable doubt that Darryl Jones had engaged in the criminal conduct in question—the arrest itself was probative because it was based on probable cause to believe that Darryl Jones engaged in an assault against a police officer. Thus, it was logical for Agent Shelton to premise his application for a no-knock provision, one requiring only a *reasonable suspicion* that knocking and announcing would be dangerous, on an arrest that required *probable cause* to effectuate. *See Richards, supra,* 520 *U.S.* at 394, 117 *S.Ct.* at 1421–22, 137 *L.Ed.*2d at 624 (explaining requirement that police articulate reasonable suspicion, rather than higher showing required to demonstrate probable cause, "strikes the

appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries").

The Appellate Division, in discounting Darryl Jones's criminal history, found it "significant" that he was never convicted of the assault charge but, instead, pled down to unlawful possession of a weapon, a crime of the fourth-degree. *Jones, supra,* 358 *N.J.Super.* at 434, 818 *A.*2d at 401. We disagree with the significance of that fact for two reasons. First, as we observed in *State v. Evers,* 175 *N.J.* 355, 398, 815 *A.*2d 432, 457 (2003), "[p]lea offers are tendered for a multitude of reasons," many of which are administrative in nature. The fact that an offender eventually pled to a lesser-included offense does not undermine the probative value to officer safety suggested by the original charges against a suspect. *Cf. State v. Marzolf,* 79 *N.J.* 167, 180–81, 398 *A.*2d 849, 855–56 (1979) (approving consideration of large quantity of marijuana as relevant factor in sentencing defendant who plead guilty to "simple possession," explaining that "possession of a drug is rarely 'simple' and should not be so considered solely because the surrounding circumstances have not justified or might not sustain beyond a reasonable doubt the more serious charges associated with distribution").

Second, we do not believe that the final disposition of the charges is dispositive in this appeal because that information was not in the warrant application. As such, it could not have been used by the judge to assess the reasonableness of Agent Shelton's suspicions as contained in the four-corners of his affidavit. *See Schneider, supra,* 163 *N.J.* at 363, 749 *A.*2d at 351 ("When a search or seizure is made pursuant to a warrant, the probable cause determination must be made based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously."). Accordingly, we are required to consider the reasonableness of the no-knock provision in view of Darryl Jones's arrests, not his subsequent convictions.

At oral argument, defendant suggested that the police might have concealed the disposition of the assault charge from the local municipal court judge who issued the warrant. We decline to consider that claim because it was not raised below and because defendant has offered no basis in the record to support it. That said, we note that the willful concealment of such information from the judicial officer issuing a search warrant may undermine the finding of probable cause and result in the suppression of evidence seized during a search based on the warrant. *See United States v. Reivich,* 793 *F.*2d 957, 960–61 (8th Cir.1986) (recognizing that facially sufficient affidavit can be challenged on grounds it includes deliberate falsehoods or willful omissions that make affidavit misleading).

In this case, as we have stated, the criminal histories provided by the police were sufficient to establish a reasonable suspicion of a danger to officer safety. For future guidance, we observe that the relevant arrest records disclosed in supporting affidavits generally should include the disposition of those arrests. When the disposition of an arrest forming the basis of a no-knock warrant application is readily accessible to the police, inclusion of such information will improve the quality of proof considered by a judge within the totality-of-circumstances framework. For example, if a computerized criminal history report relied on by an officer disclosed both arrest and conviction information, and an officer relies on an arrest from that report to justify a no-knock entry, we expect the officer to include the corresponding conviction information in the warrant application. Similarly, when the ultimate disposition of an arrest is not disclosed in the reports relied on by an officer, an explanatory statement in an officer's affidavit would assure the judge that the affiant made reasonable efforts to provide the court the most complete and accurate record possible in the circumstances presented.

Our purpose is not to impose an additional obligation on the police. The presence or absence of the information we recommend will not affect the presumption of validity that attaches once

a warrant has been issued. We offer these observations to ensure that judges faced with the task of determining whether to abrogate the knock-and-announce requirement in a particular case have at their disposal all relevant information necessary to make a decision based on the totality of the circumstances.

Defendant also argues that the arrest is too remote in time to be relevant. The Appellate Division echoed that concern when it described the arrest as "stale." *Jones, supra,* 358 *N.J.Super.* at 435, 818 *A.*2d at 402. Although the prior assault was seven years old at the time of this search, we believe it was of sufficient probative value to be considered by the municipal court. In the context of evaluating an officer's reasonable suspicion that a suspect poses a heightened risk to officer safety, the use of a prior criminal act is subject to a less-stringent test than that applied to the admission of a prior conviction to impeach a defendant's credibility. *N.J.R.E.* 609; *State v. Sands,* 76 *N.J.* 127, 144–45, 386 *A.*2d 378, 386–87 (1978). The use of a defendant's criminal history for impeachment requires a careful balancing of the relevance of the crime with respect to credibility against the prejudicial effect its disclosure would have on a defendant. In contrast, when a suspect's criminal record is used as a factor to determine the increased risk posed to the lives of police officers, no such balancing is required because that same risk of prejudice is not present. Our observation in *Valentine* proves especially apt here:

> [T]he reason for limiting the use of prior crime evidence at trials is not because the evidence is not relevant but because it has the unfair effect of overcoming the presumption of innocence. That unfairness is not equally present when we are assessing an officer's articulable concerns for personal safety.... To allow the judiciary to take prior criminal history into account in the review of probable cause determinations ..., while denying law-enforcement officers the power to take it into account when confronting a suspect on the street would make little sense.... The much more immediate need to protect oneself demands that we permit law-enforcement officers to take criminal history into account.
>
> [134 *N.J.* at 550–51, 636 *A.*2d at 512 (internal citations omitted).]

In short, we cannot require police officers, when they confront suspects who have a significant history of criminal activity, some of which directly suggests a tendency for violence towards the

police, to treat those suspects as they would non-violent offenders whom they encounter for the first time.

The evaluation of the reasonableness of a no-knock warrant application cannot be made in a theoretical vacuum. The determination is highly fact sensitive and requires a balancing of risks. Among those factors the court must take into account are the practical risks to the officers' lives and safety, which are of especial concern when a warrant is to be executed in a home. As the United States Supreme Court has observed:

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.
>
> [*Maryland v. Buie*, 494 *U.S.* 325, 333, 110 *S.Ct.* 1093, 1098, 108 *L.Ed.*2d 276, 285 (1990).]

Society has a "weighty interest in officer safety...." *Maryland v. Wilson*, 519 *U.S.* 408, 413, 117 *S.Ct.* 882, 885, 137 *L. Ed.*2d 41, 47 (1997). "As the front line against violence, law-enforcement officers are particularly vulnerable to violence[,] often becoming its victims." *Valentine, supra*, 134 *N.J.* at 545, 636 *A.*2d at 510. That observation, made over a decade ago, holds just as true today. In 2002, 3296 of this State's law enforcement officers were assaulted in the line of duty. *Uniform Crime Report: State of New Jersey* (2002) at 188. Nationally, 58,066 law enforcement officers were assaulted in the line of duty, and 56 of those assaulted were feloniously killed in 2002. Federal Bureau of Investigation, *Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted* (2002) at 5, 73. Of the sixty-one known assailants responsible for causing the felonious deaths of those law enforcement agents, seventy-nine percent had prior criminal arrests, fifty-nine percent had been convicted of prior criminal charges, and thirty percent had been previously arrested for crimes of violence. *Id.* at 7. Sixteen percent of those murder assailants had prior arrests for assaulting an officer or resisting arrest and thirty-one percent had prior arrests for weapon violations. *Ibid.*

Those statistics demonstrate that law enforcement officers face a high risk of violence in the performance of their duties. Moreover, as the Attorney General argued, the data suggests that recidivism has a predictive value because of an apparent correlation between prior criminal activity and the threat posed to police officers when they face those same individuals again. As we acknowledged in *Valentine, supra*, "[g]iven the volatile times in which we live, we certainly cannot require police officers to ignore the fact that a suspect whom they are confronting has a history of criminal behavior...." 134 *N.J.* at 550, 636 *A.*2d at 512.

Our view allows police officers seeking a no-knock warrant to apply the same considerations that the judiciary considers in like circumstances. Thus, judges may consider arrests and the actual circumstances of the offense when assessing the threat that a defendant poses to society during imposition of a sentence. *State v. Green*, 62 *N.J.* 547, 571, 303 *A.*2d 312, 325 (1973) (noting sentencing judge may consider record of adult arrests that did not result in convictions). Sentencing judges must fully assess the totality of circumstances surrounding a defendant's actual criminal offense. *Marzolf, supra*, 79 *N.J.* at 180, 398 *A.*2d at 855; *see also State v. Brooks*, 175 *N.J.* 215, 230–31, 814 *A.*2d 1051, 1060–61 (2002) (condoning use of arrests and dismissed offenses to determine defendant's eligibility for admission into pretrial intervention program). Just as the case law requires a judge to consider a defendant's violent nature when sentencing in order to protect society, so too a judge should evaluate a defendant's violent history, including arrests, in determining whether to vest the police officer with both the advantage and protection of surprise in executing a warrant when safety considerations are present.

Finally, there is additional evidence in Agent Shelton's affidavit that demonstrates, in the totality of the circumstances, that a no-knock entry was appropriate in this case. Based on the affidavit, the municipal court judge was aware that there was probable cause to believe the suspects named in the warrant were engaged

in ongoing criminal activity. As noted by the trial court when it denied the motion to suppress, the "unfortunate marriage that often occurs between drugs and weapons" is a factor that should be considered when a defendant has a criminal history suggesting violence towards the police. In addition to the ongoing drug sales, the judge was aware that multiple offenders were involved in the drug activity.

At least one of those offenders, Powell, had several prior drug-related arrests and had two convictions for drug distribution. Because those convictions would have made Powell eligible for an extended sentence, *N.J.S.A.* 2C:43–6(f), the imposition of which is generally the "norm" for a repeat offender, *State v. Lagares,* 127 *N.J.* 20, 32, 601 *A.*2d 698, 704 (1992), it would not have been unreasonable to conclude that Powell had a strong incentive to resist capture by the police. Faced with the possibility of encountering multiple offenders engaged in ongoing criminal activity, one of whom had a criminal history suggesting an assault of a police officer and another who had a strong incentive to evade capture, it was reasonable to conclude that knocking and announcing the police presence at the Wildwood residence would pose a heightened risk to officer safety.

In sum, we conclude that the no-knock provision of the warrant issued on the basis of Agent Shelton's affidavit was valid. According the appropriate deference to the issuing court, we hold that Darryl Jones's prior arrest for assault on a police officer, which was itself highly probative of the potential for violence during the execution of the search warrant, when coupled with the ongoing drug activities of multiple individuals facing the potential for enhanced sentences, provided a particularized, reasonable suspicion that officer safety would be compromised unless the police were permitted to dispense with the knock-and-announce requirement.

## IV.

In view of its holding regarding the validity of the warrant, the Appellate Division did not address defendant's sentencing claim.

*Jones, supra,* 358 *N.J.Super.* at 436 n. 5, 818 *A.*2d at 402 n. 5. That issue was not raised in the petition for certification nor addressed by the parties in their supplemental filings. We, therefore, remand the matter to the Appellate Division for consideration of the sentencing issue.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to that court for resolution of defendant's sentencing claim. We do not retain jurisdiction.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—7.

*Opposed*—None.